547 A.2d 1086

**Ronald Nathaniel WOOTEN–BEY**

**v.**

**STATE of Maryland.**

**No. 31, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Oct. 3, 1988.

604

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Norman L. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams Jr., State's Atty. for Prince George's County, on brief, Upper Marlboro), for appellee.

Submitted before WILNER, ROSALYN B. BELL and POLLITT, JJ.

ROSALYN B. BELL, Judge.

Ronald Nathaniel Wooten–Bey was convicted by a jury in the Circuit Court for Prince George's County of felony murder, attempted robbery with a deadly weapon, and the use of a handgun in the commission of a crime of violence.[1] The trial court imposed sentences of life imprisonment and 20 years, to be served consecutively.[2] Wooten–Bey raises the following issues on appeal:

—Was it reversible error for the trial court to deny Wooten–Bey access to his counsel during a luncheon recess?

---

**1.** This was Wooten–Bey's second trial. The previous trial, arising from the same incident, resulted in Wooten–Bey's acquittal of premeditated murder and a conviction of conspiracy to commit robbery. The jury at the first trial was deadlocked on the felony murder charge and a mistrial as to this charge resulted. In *Wooten–Bey v. State,* 67 Md.App. 606, 508 A.2d 1010 (1986), we held that Wooten–Bey's acquittal of premeditated murder did not bar his retrial for felony murder. This decision was affirmed in *Wooten–Bey v. State,* 308 Md. 534, 520 A.2d 1090, *cert. denied,* — U.S. ——, 107 S.Ct. 2199, 95 L.Ed.2d 853 (1987).

**2.** The State unsuccessfully sought the death penalty.

—Did the trial court improperly advise Wooten–Bey about his right not to testify?

—Did the trial court strike prospective jurors for cause without a sufficient basis?

—Should the trial court have admitted evidence offered by the defense purportedly showing that Wooten–Bey voluntarily surrendered?

—Did the trial court improperly restrict the cross-examination of a prosecution witness?

—Were the trial court's jury instructions incorrect and biased in the prosecution's favor?

—Does the rule of lenity operate so as to prevent Wooten–Bey's conviction of both conspiracy to rob and attempted robbery with a deadly weapon?

We affirm, and hold that Wooten–Bey received a fair trial. We explain, addressing each issue raised by Wooten–Bey in the order in which it appears above. Facts relevant to each issue will be provided as necessary.

### RIGHT TO COUNSEL

Appellant testified in his own defense. Near the close of his direct testimony, appellant's attorney asked the trial judge if appellant could continue his direct testimony after the luncheon recess:

"MR. CHRISTMAS [appellant's attorney]: Your Honor, I think I have about five more minutes, but I'm not sure. May I inquire if we might take a luncheon break, and I can finish within five minutes. I may have even less then [sic] that, if that is agreeable?

"THE COURT: All right. [Jury Foreman], and ladies and gentlemen, we will indeed break until 1:30 for lunch. In case he's fooling, normally I don't break until 1:15, but I've already ordered the jail cases to be here at 1:00. All right. Mr. Wooten–Bey, you are a sequestered witness sir, which means you may not now discuss with anybody, including Mr. Christmas anything about your testimony on the witness stand, because you are sequestered.

"MR. CHRISTMAS: I think I do have the right to talk about what I may ask him.

"THE COURT: Under no circumstances may you talk to a witness under oath on the witness stand. You, or Mr. Harvey [State's Attorney], or anybody. That witness is sequestered, and under oath, and going through their testimony. As opposed to a sequestered witness outside, you can talk to. But not once the witness is sequestered by the oath, they're not to be approached by anybody. And with that, we'll—please keep the admonitions in mind, [jury foreman], and ladies and gentlemen, and we'll recess for lunch until 1:30."

The trial judge then qualified this statement,[3] telling defense counsel that he was *not* forbidding all consultation between appellant and his attorney during lunch, only consultation concerning appellant's "prospective testimony." When the trial court reconvened after lunch, appellant's attorney had only two brief questions for his client before finishing his direct examination.[4] Cross-examination and redirect then ensued. After the prosecutor had completed his recross-examination, appellant's attorney informed the trial court that, although he wished to rest the defense, appellant wanted to resume the stand because he felt he had been "rushed" through his testimony. The trial judge excused the jury for a recess and the following colloquy took place:

"THE COURT: Well, now that he's off the stand, Mr. Christmas, how about taking the opportunity, if you feel

3. This was the trial judge's later recollection of what he had told defense counsel. "I told them they could confer, but they couldn't talk about testimony." This statement was not recorded by the court reporter because recording stopped during the bailiff's cry of "all rise." The trial judge offered this addition to the record at the January 12, 1988 hearing on defense counsel's motion for a new trial. Appellant's counsel stated that he had a different recollection of what was said.

4. Counsel asked appellant the date of his arrest (October 4, 1983) and whether appellant had been incarcerated since that time, to which appellant responded affirmatively.

it will be fruitful, of talking with him, and see what it is he wants to say, for the purpose of being able to advise him only. Not for advising me. That would be strictly confidential, what he tells you, and what you tell him. And then if he still feels that way, I'll inquire of him. If that is what he wants to do, the State says they have no objection. I'll let him do it. It's his trial. But I'll talk to him like a Dutch Uncle first. You want to talk to him ...?

"MR. CHRISTMAS: Yes.

"THE COURT: Why don't I take a five minute recess, so you can talk to the man, and maybe I can help out the situation too."

When the trial court reconvened after appellant and his attorney had conferred, appellant no longer wished to re-take the witness stand, and the defense rested. Appellant was convicted by the jury, and defense counsel filed a motion for a new trial, claiming, *inter alia,* that the trial judge had denied appellant his Sixth Amendment right to consult with counsel.

■ We agree with appellant that the trial judge erred in imposing *any* restriction on appellant's right to consult with his attorney during the luncheon recess. We decline, however, to impose a per se rule of reversal where the denial of access was brief, limited in scope, and where the trial judge gave counsel and appellant time to confer when it became apparent that they needed to do so, thus curing any constitutional defect.

In *Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 1336, 47 L.Ed.2d 592 (1976), the Supreme Court held that a trial judge's order denying the defendant all access to his attorney during a 17–hour overnight recess violated the defendant's constitutional right to counsel. The Court explicitly declined to reach the question of whether a denial under other circumstances (presumably during circumstances involving a shorter period of time) would violate a defendant's constitutional rights.

In *Geders*, the Court stated that witness sequestration orders could not be applied to a defendant in the same manner in which they could be applied to nonparty witnesses:

"But the petitioner was not simply a witness; he was also the defendant. A sequestration order affects a defendant in quite a different way from the way it affects a nonparty witness who presumably has no stake in the outcome of the trial. A nonparty witness ordinarily has little, other than his own testimony, to discuss with trial counsel; a defendant in a criminal case must often consult with his attorney during the trial. Moreover, 'the rule' accomplishes less when it is applied to the defendant rather than a nonparty witness, because the defendant as a matter of right can be and usually is present for all testimony and has the opportunity to discuss his testimony with his attorney up to the time he takes the witness stand."

*Geders*, 425 U.S. at 88, 96 S.Ct. at 1335.

The *Geders* court found that there were methods other than a deprivation of counsel to accomplish the intended goal of a witness sequestration order. One method is a skillful cross-examination designed to elicit signs of witness coaching. The evidence of coaching may then be incorporated into an opposing party's closing argument. *Geders*, 425 U.S. at 89–90, 96 S.Ct. at 1335–1336. The method most important for our analysis here is trial court control of the timing of a defendant's testimony. *Geders*, 425 U.S. at 90–91, 96 S.Ct. at 1336–1337.

In holding that the 17–hour deprivation required a new trial for the defendant, the *Geders* court reversed the decision of the Court of Appeals for the Fifth Circuit, which had held that the defendant's failure to claim that he was prejudiced by his inability to consult with his counsel was fatal to his appeal. *Geders*, 425 U.S. at 86, 96 S.Ct. at 1334. Implicit in the *Geders* holding, therefore, is that prejudice need not be shown where the deprivation has been complete and of 17–hour duration.

The question of whether a *per se* rule requiring reversal and retrial should be automatically applied for *any* deprivation of the right of a criminal defendant to consult with his attorney has not been answered by the Supreme Court. Nor has this precise question been addressed by the Court of Appeals of Maryland. The United States Court of Appeals for the Fourth Circuit has held, however, that it would not apply a *per se* rule of reversal where the deprivation occurred during a 15–minute recess, and where it had been shown that the defendant had been well represented by competent counsel throughout the proceedings, and where he had not been denied access to his attorney during numerous other recesses. *Perry v. Leeke*, 832 F.2d 837, 845 (1987).[5] Although we are not bound by an interpretation of the federal constitution made by the Fourth Circuit, *see United States ex. rel. Lawrence v. Woods*, 432 F.2d 1072, 1076 (7th Cir.1970), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1971), we are persuaded by the analysis contained in *Perry*, finding it in keeping with the Supreme Court's view expressed in *Geders*.

The facts in the instant case are even more similar to those in *Perry* than to those in *Geders*. The defendant in *Perry* was on the witness stand and had completed direct testimony when the trial judge ordered a 15–minute recess. Perry's attorney tried to speak to Perry during the recess in order to advise him of his rights on cross-examination. The trial judge refused to allow the consultation because of concern that Perry would be coached. *Perry*, 832 F.2d at 839.

In holding that this denial of the right to counsel did not mandate reversal, the Fourth Circuit stated that its previous position that it was *always* reversible error for a trial judge to prevent a defendant and attorney from consulting, *United States v. Allen*, 542 F.2d 630 (4th Cir.1976), *cert.*

---

**5.** The Supreme Court recently granted certiorari, 485 U.S. ——, 108 S.Ct. 1269, 99 L.Ed.2d 480 (1988), and will hear oral arguments on Tuesday, November 8.

*denied,* 430 U.S. 908, 97 S.Ct. 1179, 51 L.Ed.2d 584 (1977), and *Stubbs v. Bordenkircher,* 689 F.2d 1205 (4th Cir.1982), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983), was no longer viable in light of the Supreme Court's reasoning in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).

*Strickland* and *Cronic* both concerned claims of ineffective assistance of counsel. In these cases, the Supreme Court held that the analysis of claims alleging a denial of assistance of counsel must center on prejudice because the purpose behind the Sixth Amendment is to ensure that criminal defendants receive a fair trial. *Cronic,* 466 U.S. at 658, 104 S.Ct. at 2046. Therefore, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. A complete denial of counsel during a critical stage of trial, however, will mandate automatic reversal. *Cronic,* 466 U.S. at 659 and n. 25, 104 S.Ct. at 2047 and n. 25. The standard is whether the defendant received a fair trial in which "evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Strickland,* 466 U.S. at 685, 104 S.Ct. at 2063. Counsel's assistance must be such as to "justify reliance on the outcome" of the defendant's trial. *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067.

The *Perry* Court found that it made little sense to distinguish between situations involving ineffective assistance of counsel and those involving a brief denial of counsel, stating that ineffective assistance of counsel throughout a trial "is far more likely to have a prejudicial effect than the deprivation at issue here." Additionally, it noted that the Supreme Court had blurred any distinction by describing *Geders* in later opinions as both a denial of counsel case, and as a case involving ineffective assistance of counsel. *Perry,* 832 F.2d at 841.

The *Perry* Court, quoting *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), stated that "[a] *per se* rule of reversal is 'the exception and not the rule' under any circumstances." *Perry,* at 842. Such a rule is only warranted where the error is of the type that threatens the overall reliability of the trial. One of the major concerns of the *Perry* Court in imposing a *per se* rule in all situations involving even a brief denial of counsel was the high administrative and emotional price to be paid. The passage of time makes it difficult to find witnesses who have retained a clear memory of events, and makes a second prosecution problematical.

> "Even if an effective retrial is possible, it imposes enormous costs on courts and prosecutors, who must commit already scarce resources 'to repeat a trial that has already once taken place.' It imposes costs on victims who must 'relive their disturbing experiences.' While 'prejudicial error' would require a retrial regardless of the inconvenience, those who participated in the initial proceedings should not be compelled to confront these dreadful events a second time if the first trial has been fair. Retrials, moreover, may lack the reliability of the initial trial where witness testimony was unrehearsed and witness recollections were more immediate."

*Perry,* 832 F.2d at 843 (citations omitted).

The Court in *Perry* went on to determine that Perry had suffered no prejudice because he had failed to show that the brief deprivation altered his performance on cross-examination. The trial record before the *Perry* Court indicated that Perry "took full advantage of his rights on cross-examination and placed his version of events before the jury." *Perry,* 832 F.2d at 843 (footnote omitted). Other factors, such as the overwhelming nature of the physical evidence against Perry, the vigor and competence of Perry's attorneys, the brief duration of the deprivation, and the fact that there was no other claimed defect in the long trial persuaded the Court that Perry received a fair trial even if the 15–minute deprivation was error. *Perry,* 832 F.2d at 844.

In *Clark v. State*, 306 Md. 483, 510 A.2d 243 (1986), *cert. denied*, 479 U.S. 1084, 107 S.Ct. 1286, 94 L.Ed.2d 144 (1987), the Court held that prejudice need not be proved where the trial court prohibited consultation between defendant's counsel and counsel for co-defendant regarding their joint exercise of peremptory challenges. The Court went on to state, however, that the State may show that the deprivation was harmless beyond a reasonable doubt. The Court in *Clark* held that the trial court's error impaired the defendant's right to effective assistance of counsel because "effective representation means representation in which the attorney is unhindered in the lawful pursuit for knowledge which might benefit the client." *Clark*, 306 Md. at 489, 510 A.2d 243.

In the instant case, although the trial judge erred in denying appellant access to his attorney during the luncheon recess, the error was cured. When the court reconvened, the trial judge called a brief recess expressly for counsel to confer with his client. It is evident that the conference was fruitful because afterward appellant no longer wished to prolong his testimony. Appellant would also have had time during this conference to ask any questions he had concerning his rights.

We are unpersuaded that the trial judge's error in denying appellant access to his attorney in the instant case threatened the reliability of the trial. As in *Perry*, it is clear that appellant had an opportunity to and did confer with his counsel during other court recesses. The record reveals that appellant's attorney made diligent defense efforts for his client, including a fully argued new trial motion based on the deprivation.[6] As in *Perry*, appellant

---

6. During the interim between the trial and before the January 12, 1988 hearing on the defense's motion for a new trial, the prosecutor and defense counsel had a telephone conversation. In this conversation, defense counsel stated that he had asked for a luncheon recess hoping that the trial judge would instruct his client as he had done all the other witnesses. At the January new trial hearing, defense counsel acknowledged that the conversation had taken place. He asserted,

had a sufficient opportunity to present his story to the jury. The trial record shows that appellant testified at length, and was an articulate witness. Again, as in *Perry*, there was ample evidence from which the jury could find appellant guilty of the charge. Appellant did not deny that the shooting occurred and that he was present at the time. The handgun involved was found in appellant's car. Other witnesses testified to appellant's involvement. The jury in the instant case also had appellant's written statement to consider, his flight from the scene, and his failure to go to the hospital for treatment of his gunshot wound.

Appellant was admittedly deprived of his right to counsel for a longer period of time than was the defendant in *Perry*. In *Geders*, the Court did not require that prejudice be shown primarily because of the length of the deprivation and strategic importance of overnight consultation before the next day's trial. *Geders*, 425 U.S. at 88, 96 S.Ct. at 1335. The hour-long deprivation here does not rise to the level where prejudice to appellant's case can be presumed, as it was in *Geders*. Moreover, in the instant case, the trial judge remedied the deprivation by calling a recess for consultation shortly after lunch. As pointed out in *Geders*, 425 U.S. at 90, 96 S.Ct. at 1336, a trial judge has the inherent power to "direct that the examination of the witness continue without interruption until completion." The trial judge in the instant case could have required defense counsel to finish direct examination before the luncheon recess—indeed, the trial judge could have required that direct and cross-examination be completed without interruption.

---

however, that his statements should be placed in context, *i.e.,* that appellant at the time had been facing the death penalty. Additionally, appellant's attorney stated that he made the statements during one of many informal conversations in which he and the State's Attorney discussed the "personalities involved." Though defense counsel admittedly engineered the deprivation in the instant case, we make no comment on the ethics of his actions as that issue was neither raised nor briefed.

Although the Court of Appeals in *Clark* did not require that prejudice be shown, the deprivation involved there was very different from that in the instant case. What was prohibited in *Clark* was consultation between two attorneys in a joint trial. As a result of the deprivation, a concerted effort to choose jurors was impossible. In *Clark*, the effect of such a deprivation was immediately apparent, and affected the overall fairness of the conviction. In the instant case, there is no immediately ascertainable effect on appellant's conviction.

■ By our holding today, we impose no requirement that a criminal defendant divulge the contents of privileged consultations with his attorney in order to establish prejudice. Rather, we are stating that, where the deprivation is short enough so that prejudice cannot be presumed and it is apparent that the proceeding was fundamentally fair, a *per se* rule of reversal and retrial will not be applied.

For the above reasons, we hold that appellant has failed to show that the deprivation of counsel, which occurred during the luncheon recess, compromised his right to a fair trial. Under these circumstances, we cannot conclude that the deprivation would have altered the jury's verdict.

### RIGHT TO REMAIN SILENT

■ Appellant contends that the trial judge's on-the-record explanation of his constitutional right not to testify was misleading enough to constitute reversible error. We disagree and explain.

The portion of the explanation that appellant cites as erroneous is as follows:

"THE COURT: ... Let me see if I can address it to you in layman's terms. *If you choose not to take the witness stand, part and parcel of what goes along with that is the possible disadvantage that somebody on that jury panel is going to say, look, this guy is obviously guilty, because guilty people hide.* And innocent people are willing to talk.

"That could happen, and *all the judges instructions in America can not overcome a person who is of contrary mind, if you know what I mean. If I sit there and say you can't do this, and they say, the hell I can't.* So if you don't testify, obviously one of the disadvantages that could go along with not testifying, it doesn't mean it will. If they listen to my instructions to a fair-thee-well, and most jurors do.

"It's my experience they follow judges instruction's [sic] right down the line. Then that adverse part would not play a part. I can not tell you, you're saying to me, but what is this business about Harvey getting to cross examine me? Well, if you do take the witness stand, Harvey, Mr. Harvey will have the right to cross examine you. He may choose not too. Although honesty impels me to say, I can't conceive of that." (Appellant's emphasis.)

What appellant fails to mention is that this was the second time during the trial that the judge had touched on the right to remain silent. In fact, the portion appellant contends as error was in reality a continuance of a previous discussion between appellant, his attorney, and the trial judge.

Before a jury had been impaneled, appellant's attorney requested and was granted an in camera hearing. At this hearing, the attorney asked to be released, informing the trial judge that he and appellant were "diametrically opposed" in regard to a defense.[7] The trial court declined to release Wooten–Bey's attorney. After the State's Attorney asked the trial judge to make an explicit finding that appellant did not intend to represent himself at trial, the following exchange occurred:

---

7. It is clear from the record that appellant's attorney strongly disapproved of appellant's rejection of the State's offer to withdraw its request for the death penalty in exchange for appellant's plea of guilty to the felony murder charge.

"THE COURT: Well, let's find out from [appellant] what he is asking for. What would you like?

"[APPELLANT]: Ideally, I would like Mr. Christmas to be able do [sic] handle my case. But if he, as he has stated, has problems with a defense in my behalf, I believe whole heartedly, that *my greatest defense is going to be me on the stand. It basically boils down to, your Honor, what I believe to be the truth, and what the State is presenting. And his witnesses will have to testify on that behalf, and I'll have to testify for the defense.*

"That is basically the way it was in the first trial. Legal tactics, I'm not a lawyer. So to answer Mr. Harvey, I don't wish to represent myself...." (Emphasis added.)

The trial judge, obviously concerned that appellant understood the ramifications of his decision to testify, went on at some length to instruct appellant in this regard. During the ensuing discussion, appellant received a detailed explanation of his right to remain silent and, if appellant chose not to take the stand, "the Court's instruction to the jury in the strongest of terms, will be that they may not in anyway what-so-ever consider your silence in deciding upon your guilt or innocence." The trial judge went on to say that such an instruction was appellant's right and that, if the jury disregarded the instruction, it "would be in total violation of their office." Additionally, appellant fails to mention that the trial judge had, just minutes before the allegedly misleading explanation, at his counsel's request, informed appellant that both the federal and state constitutions afforded him the absolute right not to testify and that appellant was not required to prove his innocence.

A long exposition to the accused on his right not to testify at his trial is unnecessary. Indeed, the trial judge covered the basics in the passages we have referred to above. In *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, *reh'g denied,* 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730 (1965), the Supreme Court held that it was a

violation of the Fifth Amendment for a jury to consider an accused's failure to testify in his own defense. In *Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 1121, 67 L.Ed.2d 241 (1981), the Court held that a criminal defendant has a Fifth Amendment right to a cautionary instruction forbidding the jury from drawing any inference from an accused's failure to testify. The question here, however, is not the existence of these rights, but whether appellant was misled and induced by the trial judge's explanations into taking the stand, thus risking the jury's exposure to his prior criminal record.

We have taken the trouble to detail these parts of the trial judge's explanation excluded in appellant's assignment of error in order to show the breadth of the full comments made to appellant. It is apparent from appellant's statements contained in the trial record, *supra*, that he had made a decision to testify long before the trial judge made these allegedly erroneous comments. The trial judge made a full explanation to appellant then, and gave another full explanation before appellant was to testify. Appellant was an articulate and well-educated person—in fact, a college graduate. The record shows that he received and understood the ample instruction about his right to remain silent, but that he was determined to testify in spite of counsel's advice to the contrary. Indeed, it is obvious from the record that the trial judge gave appellant extensive information at appellant's counsel's request, and in response to appellant's direct questions of the court. We hold that the trial judge did not err.

## VOIR DIRE EXAMINATION OF PROSPECTIVE JURORS

During the voir dire examination of prospective jurors, the trial court asked any juror to stand if he or she had any moral, ethical, religious, political or other objection to the death penalty which would enter into his or her determination of a verdict, or which would prevent the juror from following court instructions. Fourteen jurors stood

and were excused by the trial judge without an individual inquiry as to how or why their verdict might be affected. Appellant asserts that this removal of jurors was error because such an examination could have been "enlightening and fruitful," and because the prospective jury candidates may have misunderstood the trial judge's question. Appellant also asserts that the trial court erred in excusing a juror who stated that "[i]t's kind of hard to say," when asked if he could reach a fair and impartial verdict in spite of a relative's incarceration for murder. We disagree and explain.

In *Witherspoon v. Illinois*, 391 U.S. 510, 522–23, 88 S.Ct. 1770, 1776–78, 20 L.Ed.2d 776, *reh'g denied*, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968), the Supreme Court held that the State infringes a capital defendant's constitutional right to trial by an impartial jury when it excuses for cause all those members of the venire who express objections to the death penalty. Jurors may be excused for cause if they make it

"unmistakably clear ... that they would *automatically* vote against the imposition of capital punishment or ... that their attitude ... would prevent them from making an impartial decision as to the defendant's *guilt.*"

*Witherspoon*, 391 U.S. at 522–23, n. 21, 88 S.Ct. at 1776–77, n. 21 (emphasis in original). The *Witherspoon* holding was, however, limited to the facts in that case—a state statute provided that it was cause for challenge if a juror expressed "conscientious scruples" to the death penalty. *Witherspoon*, 391 U.S. at 512, 88 S.Ct. at 1772.[8]

In *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the Court clarified *Witherspoon* and held that the proper standard was not that enunciated in the *Witherspoon* footnote, but was that a juror should be excused where his or her views would *prevent or substan-*

---

**8.** In *Witherspoon,* nearly half of the venire persons were excused for cause because they expressed qualms about capital punishment. *Witherspoon,* 391 U.S. at 513, 88 S.Ct. at 1772.

*tially impair* the performance of the juror's duties in accordance with the juror oath and the court's instructions. This standard does not require that a juror's bias be proved with unmistakable clarity; rather, the trial judge must be accorded the deference to exclude those jurors who appear to be incapable of faithfully and impartially applying the law. *Wainwright,* 469 U.S. at 426, 105 S.Ct. at 853. In applying the new standard, the *Wainwright* Court held that the trial court did not abuse its discretion in excusing for cause a juror who stated that her opinions about the death penalty would interfere with her determining the guilt or innocence of the defendant. *Wainwright,* 469 U.S. at 430, 105 S.Ct. at 855.

"[A]s long as the selection procedure results in a fair and impartial jury, the method and manner of conducting a voir dire rests within the sound discretion of the trial court." *Colvin v. State,* 299 Md. 88, 102, 472 A.2d 953, *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984). In *Colvin,* the Court held that it was no abuse of discretion for the trial judge to deny a request for individualized voir dire in a capital case. *Colvin,* 299 Md. at 103, 472 A.2d 953. *See also Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 *reh'g denied,* 467 U.S. 1268, 104 S.Ct. 3564, 82 L.Ed.2d 865 (1984).

Rule 4–312(d) provides in pertinent part:

"The court *may* permit the parties to conduct an examination of prospective jurors or *may* itself conduct the examination after considering questions proposed by the parties. If the court conducts the examination, it *may permit* the parties to supplement the examination by further inquiry or may itself submit to the jurors additional questions proposed by the parties." (Emphasis added.)

It is thus apparent that the trial judge was not required to allow defense counsel to question individually each juror—nor was the trial judge required to conduct such an individualized examination. Rule 4–312(d) is couched in

permissive terms. The question thus becomes whether the selection procedure resulted in a fair and impartial jury panel. We hold it did.

Appellant argues that the excusing of these 14 prospective jurors was without cause. The record indicates that the trial judge intended and did separate that group of prospective jurors to whom the death penalty would pose a problem. As the Court noted in *Calhoun v. State,* 297 Md. 563, 583, 468 A.2d 45 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 *reh'g denied,* 467 U.S. 1268, 104 S.Ct. 3564, 82 L.Ed.2d 865 (1984), a juror must be able to set aside his opinions and render a verdict based solely on the evidence presented.

As pointed out in *Wainwright,* there is no magic litany for determining when a juror's opinions would affect the juror's sworn duty. Explicit in the trial judge's question to prospective jurors was that these jurors would *not* be able to ignore their predilections and follow court instructions. The only appreciable difference between this case and *Wainwright* is the fact that here the trial judge's questions were addressed to the jurors as a group, and not to each juror individually. Appellant contends that individual questioning would have revealed jurors who misunderstood the trial judge's question, or who might *later* decide that they could follow his instructions. We find these contentions unpersuasive because in any voir dire, be it individual or group, is the risk of misunderstanding. The trial judge's question was not inherently confusing. Similarly, a juror, even if individually questioned, might decide later that he or she could do what the juror said previously he or she could not do. At some point, one must take a juror's answer as a given. As the Court found in *Wainwright,* unmistakable clarity is not required. We hold that to strike these jurors for cause was not an abuse of discretion.

In regard to the juror who stated that "[i]t's kind of hard to say," a serious question existed as to that juror's impartiality. We hold that the trial court did not abuse its discretion in striking this juror for cause.

## VOLUNTARY SURRENDER

■ Appellant contends that the trial judge improperly excluded evidence that appellant did not resist extradition to Maryland to face the charges against him. Appellant argues that, because the State had introduced evidence of appellant's flight after the fatal shooting, he should have been permitted to introduce the evidence that he did not resist under *Pierce v. State*, 62 Md.App. 453, 490 A.2d 261 (1985). We disagree and explain.

We stated in *Pierce* that evidence of a defendant's flight is relevant because flight may reflect an awareness of guilt. The State may thus introduce such evidence. A defendant, however, can introduce proof of voluntary surrender to rebut this inference. Ordinarily, such evidence is irrelevant because voluntary surrender is considered usual behavior. It is only relevant to rebut the inference created by flight. *Pierce*, 62 Md.App. at 456, 490 A.2d 261. In *Pierce*, we were presented with a different issue from that in the instant case—whether a trial court was required to instruct the jury that voluntary surrender could indicate innocence. We held that no specific instruction was necessary. *Pierce*, 62 Md.App. at 458, 490 A.2d 261. The trial court in *Pierce*, however, did admit evidence that the defendant had returned home after her alleged flight in order to make arrangements for her children, but voluntarily surrendered to police the next morning.

What is lacking in the instant case is evidence that appellant voluntarily surrendered. The evidence appellant sought to have admitted was not and could not have been of "voluntary surrender," but was rather that appellant did not resist being returned to Maryland. Appellant was apprehended at police gunpoint when spotted in Washington, D.C. By no stretch of the imagination are we able to hold that these circumstances constitute voluntary surrender. Applying the *Pierce* standard, the inference of awareness of guilt created by a defendant's flight is not rebutted by submission to later extradition. We therefore hold that

the trial judge did not err in excluding this evidence as irrelevant.

## RESTRICTION OF CROSS-EXAMINATION

Detective San Felice testified for the State at appellant's trial. During cross-examination, appellant's counsel asked these questions of San Felice concerning the circumstances under which appellant gave his statement to police:

"Q. All right. Then you closed the door of the Metropolitan Police Department Homicide, and you talked to him twenty minutes while he's a prisoner of the Metropolitan Police Department; is that correct?

"A. Yes, sir.

"Q. Where are your notes of this discussion?

"A. They're up in the State's Attorneys Office.

"Q. Mr. Harvey, do you have those?

"MR. HARVEY: Not with me.

"BY MR. CHRISTMAS:

"Q. Well, you knew you were going to testify this morning, didn't you?

"A. Yes, sir.

"Q. And you didn't bring your notes with you?

"A. No, sir.

"Q. You knew I would ask you, or you surmised I would ask you a question about your notes, didn't you?

"MR. HARVEY: Objection, irrelevent [sic].

"MR. CHRISTMAS: State of mind.

"MR. HARVEY: Irrelevent [sic].

"MR. CHRISTMAS: Credibility.

"THE COURT: Not one of the recognized modes of impeachment. Sustained."

The scope of cross-examination is limited to matters put in issue on direct examination, *Plank v. Summers*, 205 Md. 598, 607, 109 A.2d 914 (1954), and the credibility of the witness. *DeLilly v. State*, 11 Md.App. 676, 681, 276 A.2d 417 (1971). Additionally, a trial court may exercise its discretion to allow inquiry into additional matters. *Cald-*

*well v. State,* 276 Md. 612, 618, 349 A.2d 623 (1976). In cross-examination, it is "proper to allow any question which reasonably tends to explain, contradict or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character, or credibility." *DeLilly,* 11 Md.App. at 681, 276 A.2d 417. It has been suggested that perhaps a more lenient standard should be applied where the defense is cross-examining a prosecution witness because cross-examination is the tool by which the constitutional right to confront one's accuser is given substance. *See State v. DeLawder,* 28 Md.App. 212, 344 A.2d 446 (1975). In *Waldron v. State,* 62 Md.App. 686, 697, 491 A.2d 595, *cert. denied,* 304 Md. 97, 497 A.2d 819 (1985), we held that it could be an abuse of discretion for the trial court to limit cross-examination for a prosecution witness in a manner preventing the defense from demonstrating bias or prejudice on the part of the witness. *Waldron,* 62 Md.App. at 697, 491 A.2d 595. "It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop." *Waldron,* 62 Md.App. at 696, 491 A.2d 595, quoting *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931). We went on to state in *Waldron,* however, that what the cross-examiner seeks to accomplish must be immediately obvious from the question asked or from an offer of proof. *Waldron,* 62 Md.App. at 698, 491 A.2d 595.

■ In the instant case, appellant's counsel was allowed to ask numerous questions in regard to the detective's procedures and the substance of notes he made regarding appellant's statement. The only information requested and excluded by the trial court was whether the detective had realized that appellant's counsel would ask questions about the notes. Appellant does not maintain that he either requested or subpoenaed the detective's notes for use at trial. The detective was therefore under no obligation to

bring his notes to trial.[9]

It could be argued that the question posed by appellant's counsel should have been allowed because it would have eroded the jury's assessment of San Felice's credibility if the defense could show that the detective had deliberately left his notes behind. We cannot conclude that the trial judge's exclusion was an abuse of discretion, however, because the record shows that the trial judge allowed an otherwise full inquiry of the detective concerning his notes. We therefore hold that the trial judge's exclusion of this question did not prohibit appellant's demonstration of bias or prejudice.

## JURY INSTRUCTIONS

Appellant points to several ways in which the trial court's jury instructions were incorrect. We find no merit in these contentions.

Appellant argues that the jury instructions were defective because they were propounded in a manner highly favorable to the prosecution. Appellant, however, lodged no objection to the alleged State orientation of the instructions. Thus, the issue is not preserved for our review. Rule 8–131(a).

Appellant's next contention is that the trial judge erred in not clearly instructing the jury that a not guilty verdict was possible on the felony murder charge. We find this assertion is incorrect. The jury was given a verdict sheet and the trial judge instructed:

"THE COURT: ... I'm going to submit to you ... what we call a verdict sheet. It's just something to assist you all in your deliberations. When you come back, we will ask you essentially what is on the sheet. *Which is, how do you find to felony murder? Which will either*

---

**9.** Appellant does not contend that his defense was prejudiced by a lack of access to these notes. Detective San Felice was also called during appellant's defense, at which time the notes were in the possession of appellant's counsel.

*be guilty or not guilty.* Attempted robbery with a dangerous or deadly weapon, either guilty, or not guilty, and use of a handgun in the commission of a violent crime, either guilty or not guilty. We await your considered deliberations." (Emphasis added.)

More important, implicit in the trial judge's instructions in regard to the presumption of innocence and reasonable doubt was the jury's duty to find appellant not guilty if the State failed to prove its case.

Appellant's last contention in regard to the jury instructions is that the trial judge erred in not instructing that in order to convict appellant there must be a direct causal connection between the felony and the victim's death. The trial court read the applicable statute to the jury. We need only point to the instruction given to show that it contained the required elements:

" 'In order to convict the defendant of first degree felony murder, the State must prove, one, that the defendant, or another, participating in the crime with the defendant, committed, or attempted to commit,' in this case a robbery....

"[H]ere it's the commission of a simple robbery. If they committed, or attempted the [sic] commit a simple robbery. 'Two, that the defendant, or another, participating in the crime, killed the victim.' In this case [the victim]. *'And three, that the act resulting in the death of [the victim] occurred during the commission or attempted commission of the robbery....'* " (Emphasis added.)

We hold that the jury was adequately informed that, in order to convict appellant of felony murder, it had to find that appellant (or another) *participating in the crime* killed the victim.

## RULE OF LENITY

■ At his first trial, appellant was convicted of conspiracy to rob and sentenced to 10 years. The jury at the first

trial could not agree as to a felony murder charge and a mistrial as to this charge was declared. *See* n. 1, *supra.* At the retrial leading to this appeal, appellant was convicted of attempted robbery with a deadly weapon, as well as of felony murder.[10] Appellant contends that, under the rule of lenity, only a single conviction for robbery was permissible, and asks us to merge his conviction for conspiracy to rob into the attempted robbery conviction.

The "required evidence test" is used to determine whether two offenses arising from the same incident are to be treated as one for merger purposes. If *each* offense requires proof of a fact which the other does not, the offenses are not the same and will not merge. If only one offense requires proof of a fact which the other does not, however, the offenses are deemed the same and separate sentences for each offense are prohibited. *Brooks v. State,* 284 Md. 416, 419, 397 A.2d 596 (1979). Appellant concedes, as he must, that application of the required evidence test shows conspiracy to rob and attempted armed robbery to be separate offenses. Hence, appellant relies on the rule of lenity.

This rule is based on the concept that in certain circumstances the Legislature may not have intended that two separate sentences be imposed for two offenses growing out of the same transaction, even though application of the required evidence indicates that the two crimes are distinct. *Johnson v. State,* 56 Md.App. 205, 212, 467 A.2d 544 (1983), *cert. denied,* 299 Md. 136, 472 A.2d 999 (1984). In *Walker v. State,* 53 Md.App. 171, 201, 452 A.2d 1234 (1982), *cert. denied,* 296 Md. 63 (1983), we pointed out that application of the rule

"is purely a question of reading legislative intent. If the Legislature intended two crimes arising out of a single act to be punished separately, we defer to that legislated

---

**10.** Appellant's conviction of attempted robbery formed the predicate felony underlying his felony murder conviction. The trial judge merged the attempted robbery with the felony murder conviction and imposed a life sentence on appellant for felony murder.

choice. If the Legislature intended but a single punishment, we defer to that legislated choice. If we are uncertain as to what the Legislature intended, we turn to the so-called 'Rule of Lenity,' by which we give the defendant the benefit of the doubt." (Citations omitted.)

Thus, where the legislative intention is not clear from the statute itself and reasonable minds might differ as to its intention, the Court will adopt the less harsh meaning. We are unpersuaded that the rule should be applied here.

In the instant case, the relevant legislative intent is expressed in Md.Code Ann. Art. 27, §§ 38 & 488 (1957, 1987 Repl.Vol.). Section 38 provides that punishment for a person convicted of conspiracy shall not exceed the punishment of the crime he or she conspired to commit. The gist of the common law crime of conspiracy is the unlawful combination to commit a criminal act—no overt act is required. *Quaglione v. State*, 15 Md.App. 571, 583–84, 292 A.2d 785 (1972).

Section 488 provides that a person convicted of an attempt to rob with a dangerous or deadly weapon shall be sentenced to not more than 20 years. Robbery with a deadly weapon is not a new substantive crime but is the offense of common law robbery aggravated by use of a weapon. The proscribed behavior under § 488 consists of intimidation produced by use of a weapon, coupled with the apparent ability to execute the implied threat if the victim resists. *Jackson v. State*, 231 Md. 591, 594, 191 A.2d 432 (1963).

We thus have two separate criminal acts for which the Legislature has provided distinct punishments. Appellant presents us with no case law or legislative history suggesting that the Legislature did not intend to punish both of these criminal acts, nor can it be seriously argued that an ambiguity exists when the statutes are applied in tandem. It makes sense that, because the two crimes and penalties address different criminal behavior, separate sentences be imposed. In the instant case, appellant received the first

10–year sentence for *planning* the robbery. The second sentence imposed for the attempt was for the steps appellant took toward *consummating* that plan. We therefore hold that the rule of lenity will not apply and affirm the two sentences.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.